*Romeka v. RadAmerica II, LLC, ET AL.*, No. 1207, September Term, 2020.  Opinion by Eyler, Deborah S., J.

**MARYLAND HEALTH CARE WORKER WHISTLEBLOWER PROTECTION ACT (HCWWPA OR ACT), HEALTH OCCUPATIONS ARTICLE §§ 1-502 THROUGH 1-506 --- ACTION FOR VIOLATION OF HCWWPA --- PROOF OF CAUSATION --- *McDONNELL DOUGLAS* EVIDENTIARY FRAMEWORK --- SUMMARY JUDGMENT.**

Ms. Romeka worked as a chief radiation therapist for RadAmerica, which supplied radiation treatment health care workers to a hospital's radiation oncology center.  Over a period of 2 ½ weeks, her superiors investigated complaints about her falsification of a medical record, incompetency endangering patient safety, and poor treatment of those she supervised and/or worked with; and the designated Human Resources Department then conducted its own investigation into the same complaints.  Ms. Romeka's immediate supervisors recommended that she be fired, and the Human Resources Department later made the same recommendation.  The day after that second recommendation, Ms. Romeka made an oral complaint to her immediate superior about a radiation therapy machine being used with a broken treatment couch.  The treatment couch had been broken for only three days.  The next day, a Friday, RadAmerica's President made the final decision to fire Ms. Romeka.  There was no evidence that he knew about her complaint when he did so.  On Monday, Ms. Romeka was fired by her immediate superior.  She asked him if she could resign instead, a request that implicitly was denied.

Ms. Romeka sued, alleging that her oral complaint was a protected disclosure under the HCWWPA and that she was fired in reprisal for making it, in violation of the Act.  She also alleged that the failure to allow her to resign instead of being fired, immediately after she was fired, was a further violation of the Act.

The circuit court granted summary judgment in favor of RadAmerica, ruling that on the undisputed material facts, Ms. Romeka could not show causation, *i.e.*, that she was fired because she had made the protected disclosure; and that RadAmerica's refusal to allow her to resign was not actionable.

*Held*: Judgment affirmed.

When all material disputed facts and all legal disputes that were not the basis of the summary judgment ruling are assumed in favor of Ms. Romeka, RadAmerica was entitled to judgment as a matter of law.  Contrary to Ms. Romeka's argument, motivating factor causation is not legally sufficient to prove causation in an action under the HCWWPA, nor is a refusal to allow an employee who just has been fired to resign a violation of that Act.

To succeed in an action under the HCWWPA, an employee must prove, among other things, that her employer took an adverse personnel action against her because she made a protected disclosure.  In such a retaliation action, when there is no direct evidence,

the order and nature of proof is governed by the evidentiary framework established for Title VII cases in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973). Under that framework: 1) the employee must produce evidence of a prima facie case, *i.e.*, that the employee engaged in a protected activity, that the employer took an adverse personnel action against the employee, and that there was a causal connection between the two; 2) the employer then bears the burden to produce evidence that the adverse action was taken for a legitimate, non-retaliatory reason; and 3) the employee then must show pretext, *i.e.*, that the legitimate reason offered by the employer was not the actual reason for the adverse action, and therefore, by inference, the real reason for the adverse action was illegal retaliation.

In employment retaliation cases under Title VII, an employee must prove that her protected activity was the but-for reason for the employer's adverse action; it is not sufficient for the employee to show that the protected activity was a motivating factor in the adverse action. *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338 (2013). Traditionally, an employee in a Title VII retaliation claim has been allowed to make out a prima facie case in the first stage of the *McDonnell Douglas* framework with proof of less than but-for causation. In *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243 (4th Cir. 2015), the court held that in retaliation cases to which the *McDonnell Douglas* framework applies, the but-for causation requirement is satisfied because, even though less than but-for causation is required at the first stage, but-for causation is the essence of proof of pretext at the third stage. By proving that her protected activity was the actual reason for the employer's adverse action, the employee is proving but-for causation.

Given the purpose and language of the HCWWPA, the reasoning in *Nassar* and *Foster* are persuasive on the issue of causation in what is a statutorily based employment retaliation action. At the prima facie case stage, proof that RadAmerica's final decision to terminate Ms. Romeka's employment was made one day after she made her protected disclosure may be, and for purposes of this opinion is assumed to be, sufficient to prove causation. The burden shifted to RadAmerica to produce evidence of a legitimate, non-retaliatory reason for firing Ms. Romeka. That burden was satisfied by evidence of the investigations into her misconduct and the recommendations to fire her based on the results of the investigations, all of which took place before she made her protected disclosure. The burden then shifted to Ms. Romeka to show pretext. Her only evidence of pretext was that witnesses for RadAmerica gave differing dates on which the decision to terminate her employment was made. The dates were not inconsistent, however; they all were dates on which recommendations were made to fire her in the course of the step-by-step process used to reach a final decision about termination. This did not show pretext and there was no other pretext evidence offered. Accordingly, on the summary judgment record, Ms. Romeka did not offer any evidence that would support a reasonable finding that she was fired because she made a protected disclosure under the HCWWPA.

Finally, Ms. Romeka asked to resign after she had been fired. At that time, she no longer was in an employment relationship with RadAmerica, which is necessary for

coverage by the HCWWPA.  In addition, it would be inconsistent to hold that RadAmerica did not retaliate against Ms. Romeka by firing her but, to avoid liability under the Act, would have had to immediately rescind that justified firing decision and allow her to resign.

Circuit Court for Baltimore City
Case No. 24-C-19-002767

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1207

September Term, 2020

_____

BRIDGET ROMEKA

v.

RADAMERICA II, LLC, ET AL.

_____

Arthur,
Leahy,
Eyler, Deborah S.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  April 27, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the Circuit Court for Baltimore City, Bridget Romeka, the appellant, sued RadAmerica II, LLC, MedStar Health, Inc., and Helixcare Medical Group, LLC (collectively "RadAmerica"),[1] the appellees, alleging that she was terminated from employment in violation of the Maryland Health Care Worker Whistleblower Protection Act ("HCWWPA" or "the Act"), Md. Code (1981, 2021 Repl. Vol.), §§ 1-502 through 1-506 of the Health Occupations Article ("HO"). The circuit court granted summary judgment to RadAmerica on the ground that, as a matter of law, Ms. Romeka's termination from employment was not causally connected to her alleged protected disclosure under the Act. It also ruled that RadAmerica's refusal to allow Ms. Romeka to resign immediately after she was fired was not actionable in a suit under the HCWWPA. We shall affirm the judgment.

## THE MARYLAND HEALTH CARE WORKER WHISTLEBLOWER PROTECTION ACT

The HCWWPA was enacted in 2002 by passage of House Bill 329, Acts 2002, c. 504, § 1, eff. October 1, 2002. The Act is designed to advance public health and safety by protecting whistleblowing health care workers.

HO § 1-502(1) prohibits an employer from "tak[ing] or refus[ing] to take any personnel action as reprisal against an employee[2] because the employee . . . [d]iscloses or

---

[1] Mercy Medical Center, Inc., ("Mercy") also was named as a defendant but was voluntarily dismissed by joint stipulation.

[2] An "employee" is "any individual licensed or certified by a board under [the Health Occupations Article] who performs services for and under the control and direction of an
(Continued)

threatens to disclose to a supervisor or board an activity . . . of the employer that is in violation of a law, rule, or regulation[.]"[3] That provision is "subject to" HO § 1-503, which requires, for protection under the Act, that an employee have a reasonable, good faith belief that the employer engaged in an illegal activity posing a substantial and specific danger to the public health and safety, and that the employee take certain procedural steps, including reporting the activity to a superior with authority to correct it.[4]

---

employer for wages or other remuneration." Md. Code (1981, 2021 Repl. Vol.), § 1-501(c)(1) of the Health Occupations Article ("HO").

[3] A "supervisor" is "any individual within an employer's organization who has the authority to direct and control the work performance of an employee, or who has managerial authority to take corrective action regarding the violation of a law, rule, or regulation of which the employee complains." HO § 1-501(d).

[4] HO § 1-503, "Criteria for protection under act[,]" states:

> (1) The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation;
>
> (2) The employer's activity, policy, or practice that is the subject of the employee's disclosure poses a substantial and specific danger to the public health or safety; and
>
> (3) Before reporting to the board:
>
>> (i) The employee has reported the activity, policy, or practice to a supervisor or administrator of the employer in writing and afforded the employer a reasonable opportunity to correct the activity, policy, or practice; or
>> (ii) If the employer has a corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation, the employee has followed the plan.

An employee "who is subject to a personnel action in violation of § 1-502" may bring a civil action against the employer. HO § 1-504(a). In such an action, a court may issue injunctive relief, reinstate the employee, remove any adverse personnel entries for the employee, reinstate fringe benefits and seniority rights, require compensation for lost wages, benefits, and other remuneration, and assess reasonable attorneys' fees against the employer if the employee prevails or against the employee if the action was brought in bad faith. HO § 1-505. It is a defense "that the personnel action was based on grounds other than the employee's exercise of any rights protected under this subtitle."[5] HO § 1-506.

In essence, the Act provides protection from retaliation. Its gist is succinctly summarized in the Fiscal Note that accompanied House Bill 329:

> The bill prohibits an employer from taking or refusing to take certain personnel actions regarding licensed or certified health care employees who disclose unlawful behavior or refuse to participate in unlawful behavior. The employees must have a good faith belief that the employer is engaged in unlawful activity, and that it poses a substantial and specific danger to public health or safety.

MD. Fisc. Note, 2002 Sess. H.B. 329.

*Lark v. Montgomery Hospice, Inc.*, 414 Md. 215, 229 (2010), is the only reported Maryland appellate opinion about the HCWWPA. There, the Court interpreted HO § 1-502 to mean that it is not a condition precedent to a suit under the Act that the plaintiff

---

[5] A civil action under HO § 1-502 must be brought within one year after the alleged violation of that portion of the Act or within one year after the employee first became aware of the alleged violation. HO § 1-504(b).

report the employer's alleged wrongdoing to an external board or agency before being terminated.[6]

## FACTS AND PROCEEDINGS[7]

RadAmerica, a wholly owned subsidiary of MedStar Health, Inc., was under contract with Mercy Medical Center, Inc., ("Mercy") to furnish medical physicists and radiation therapists for Mercy's Radiation Oncology Center ("ROC"). The RadAmerica employees in the ROC worked and interacted with the Mercy physicians and other Mercy medical and nursing staff.

Ms. Romeka was hired by RadAmerica in 2001 and worked in the ROC for most of her tenure with the company. In 2002, she was promoted to Chief Radiation Therapist. At all times relevant to this case, her direct supervisor was Christopher Osik, RadAmerica's Technical Director. Coleman Rosen, M.D., RadAmerica's Vice President of Technology Management, was Mr. Osik's manager. Ms. Romeka also worked under Fritz Lerma, M.D., RadAmerica's Chief Medical Physicist for the ROC. Maria Jacobs, M.D., not a RadAmerica employee, was Medical Director of the ROC.

---

[6] In *Parks v. Alpharma, Inc.*, 421 Md. 59, 80 (2011), which did not involve an action brought under the HCWWPA, the Court stated that the Act protects "'licensed or certified' healthcare employees that reported violations" from being terminated in retaliation for doing so. (Citation omitted.)

In the federal court system, the Act has been analyzed in one case, *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F.Supp.3d 355 (D. Md. 2017). As we shall discuss *infra*, the court in *Doe* addressed whether action taken by a former employer after an employee no longer worked for the employer was a personnel action within the meaning of the Act.

[7] The facts we recite are derived from the summary judgment record.

4

Patients were referred to the ROC for radiation treatment, including stereotactic radiosurgery ("SRS").[8]  Dr. Jacobs planned and oversaw the radiation therapy with the assistance of Dr. Lerma, who also maintained calibration of the equipment used for SRS treatments.  The RadAmerica radiation therapists were responsible for administering the SRS treatments to the patients in accordance with their treatment plans.

The ROC was equipped with a "TrueBeam" machine, manufactured by Varian, Inc. ("Varian"), that was used to administer SRS to patients with cancerous tumors in the head, neck, lung, breast, prostate, or liver.  The TrueBeam consists of a "linear accelerator" that delivers the high dose beam of radiation to the tumor; an imaging system, for visualizing the beam and the area of the patient's body receiving the radiation; and a treatment couch, on which the patient lies, in a prescribed position, when the beam is being delivered.  The proper angle for the beam is set by rotating the gantry of the accelerator around the patient while precisely positioning the treatment couch on which the patient is situated.  Ordinarily, the treatment couch is moved mechanically, using a remote-control button on a control panel immediately outside the treatment room or a remote-control device inside the treatment room.  It is possible to move the treatment couch manually, however.

---

[8] According to the National Cancer Institute, "stereotactic radiosurgery" is "[a] type of external radiation therapy that uses special equipment to position the patient and precisely give a single large dose of radiation to a tumor." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/stereotactic-radiosurgery.

At the start of each day, a radiation therapist would warm up the TrueBeam and perform various checks to make sure it was working properly. Any problem with the machine would be reported to Mercy's biomedical engineer, and if not resolved, to Varian.

Before a patient underwent treatment, the assigned radiation therapist was required to determine that all the necessary documents were in the patient's chart, which was kept in an Electronic Medical Record ("EMR"). These documents included a written consent form signed by the patient, a physician, and a witness, which was scanned into the patient's EMR. Radiation therapy was not supposed to be delivered to a patient without a completed and scanned consent form.

In this case, Ms. Romeka claims that on Thursday, May 17, 2018, she made a protected disclosure under the HCWWPA to Mr. Osik; she was terminated from employment on Monday, May 21, 2018; and her termination was causally connected to her protected disclosure. Ms. Romeka's allegations focus on the events that took place during that time frame. RadAmerica maintains that it terminated Ms. Romeka for falsifying a medical record and other serious deficiencies in her job performance. Its defense focuses on events that took place during April and May 2018, until the date Ms. Romeka was fired. We shall recite the facts in chronological order and, when in dispute and material, in the light most favorable to Ms. Romeka.[9]

---

[9] Unless stated otherwise, all dates referenced are in 2018.

### *Falsification of Patient Medical Record and Complaint by Scott Blackburn*

One of Ms. Romeka's patients underwent "radiation simulation" on April 6, began radiation treatments on April 9, and completed treatments on April 20.[10]  On April 27, a routine peer review of randomly selected EMRs of ROC patients revealed that this patient's completed consent form had not been scanned into his EMR and his first weekly chart assessment had not been completed.  Obtaining and filling out these forms and entering them in the patient's EMR had been Ms. Romeka's responsibility.  The completed consent form should have been scanned into the patient's EMR before treatment (including simulation) started.

Ms. Romeka was confronted about the missing document on the day of the random peer review.  Without authority from a superior, she accessed the patient's EMR and marked the patient's consent form as having been signed and scanned into the EMR, when it had not been.  She also backdated the first weekly chart assessment to April 9 and marked it as complete.  Thinking that at one time she had had the consent form in hand, and that it had been misplaced, she then searched for it, without success.

On May 1, Ms. Romeka told Dr. Jacobs that the patient's consent form was missing but the patient had undergone treatment.  Dr. Jacobs was "very disturbed and very disappointed" about this.  Aware that Dr. Jacobs was "pretty upset with [her,]" Ms. Romeka

---

[10] Radiation simulation is pre-treatment planning that usually involves positioning the patient on the treatment couch, making marks on the patient's skin, and taking imaging scans.  *See*  https://www.mayoclinic.org/tests-procedures/radiation-therapy/about/pac-20385162.

also told Mr. Osik about the missing consent form. Mr. Osik directed her to submit a report about the situation to MedStar's Patient Safety Event System. Ms. Romeka did so.

Also on May 1, Scott Blackburn, one of three radiation therapists working under Ms. Romeka's supervision, complained to Mr. Osik that she was subjecting them to harsh and unfair treatment. Mr. Osik relayed the complaint to Dr. Rosen and they met with Mr. Blackburn that day. Mr. Blackburn reported that Ms. Romeka was bullying the radiation therapists, not training her staff, and making mistakes that she blamed on others. He complained that Ms. Romeka did not understand "basic concepts of radiation treatment" and was disrespectful to the medical staff in the ROC. Mr. Blackburn told Mr. Osik and Dr. Rosen that all three radiation therapists were prepared to resign if Ms. Romeka were not removed as their supervisor.

### *Investigation by Mr. Osik and Dr. Rosen*

The next day, May 2, Dr. Rosen launched an investigation into Mr. Blackburn's complaint. Mr. Osik interviewed the other two radiation therapists under Ms. Romeka's supervision. They said she was incompetent on the TrueBeam, set up a patient for treatment incorrectly and then got into an argument with a physician about it, "blame[d] any staff member who is not present for problems[,]" and was rude, unhelpful, and a bully. Complaining that "[t]hey feel that they have no supervision, are blamed for everything all day long, and they do not trust [Ms. Romeka,]" they said they were "willing to resign rather than put up with [her] any longer."

On May 3, Dr. Jacobs called Mr. Osik to express her own criticisms of Ms. Romeka's work, which she described as sloppy and rushed. She complained about the

8

situation with the missing patient consent form.  Dr. Jacobs expressed concern that Ms. Romeka had created a stressful work environment in the ROC and that staff would resign for that reason.

Mr. Osik and Dr. Rosen interviewed Dr. Lerma on May 4.  He reported that recently he had been questioning Ms. Romeka's competency as a radiation therapist based on observations of how she administered treatment to patients.  One time he tried to intervene when she was setting up a patient improperly, in a way that could have led to "bodily harm[.]"  She told him to go away.  Another physician intervened and took over for her, as she "did not know what she was doing."  Dr. Lerma had witnessed Ms. Romeka being rude to staff members and physicians.  He stated that she is "difficult to speak with, always in a hurry, and does not wish to engage in conversation."

On May 6, Mr. Osik and Dr. Rosen interviewed Ms. Romeka.  When asked to explain the missing patient consent form, she said that, not knowing what to do about it, she filled in the assessment as if the form had been in the proper place at the proper time.  They asked whether what she had done could be considered falsifying a medical record.  Ms. Romeka did not answer the question, instead repeating that she had not known what to do.  Mr. Osik and Dr. Rosen described the complaints Ms. Romeka's co-workers had made and asked her to respond.  She acknowledged having yelled at Mercy ROC nurses but reported that she had a good relationship with her own staff.  In her brief, Ms. Romeka describes the complaints of her co-workers as "gripes and grudges."

On May 9, Mr. Osik and Dr. Rosen interviewed Dr. Jacobs.  She was "visibly upset."  She told them that for the past two years Ms. Romeka had been "antagonistic."  She further

9

described her as "[d]isplaying signs of paranoia[,]" being "toxic," sloppy, rushed, and disrespectful. She reiterated her concern over Ms. Romeka's handling of the missing patient consent form and was upset that Ms. Romeka had not followed up on it and seemed not to have taken the matter seriously. Ms. Romeka had commented that at most she would receive "a slap on the wrist." Dr. Jacobs recounted incidents in which Ms. Romeka was disrespectful to others working in the ROC, did not do her administrative work, which resulted in her (Dr. Jacobs) having to step in to do it, got into arguments with coworkers, including a "screaming match" with one of the doctors, and involved herself in work issues that were not her business. Dr. Jacobs asked for Ms. Romeka to be removed from her staff.[11] She expressed concern that the other radiation therapists would leave the ROC because of Ms. Romeka's behavior. Dr. Jacobs said she was losing sleep over the problems Ms. Romeka was causing in the ROC.

After meeting with Dr. Jacobs on May 9, Dr. Rosen and Mr. Osik decided that Ms. Romeka had to be removed from Mercy. The next day, upon further consideration, they decided she had to be terminated from employment. In their view, Ms. Romeka's conduct with respect to the patient's consent form was falsification of a medical record, and that made her unemployable in any of RadAmerica's locations, not just at Mercy.

As a wholly owned subsidiary of MedStar, RadAmerica followed MedStar personnel policies. Under one such policy, MedStar's Human Resources Department

---

[11] In deposition, Ms. Romeka acknowledged that Dr. Jacobs had the authority to remove her from the ROC staff: "What Dr. Jacobs says goes. If she wanted me out, I would be out. She has done it in the past."

10

would conduct an independent investigation before an employee of RadAmerica would be terminated from employment. On May 10, Dr. Rosen contacted Wendy Greer, of MedStar Human Resources, and told her about the results of the investigation he and Mr. Osik had conducted and that they had decided Ms. Romeka should be terminated from employment. He asked Ms. Greer to perform her own investigation and review the grounds they had found for terminating Ms. Romeka.

### Dr. Lerma's Complaint and Communications with Mr. Spearman and Dr. Rosen

On May 10 and 11, before Ms. Greer began the Human Resources investigation, Dr. Lerma witnessed Ms. Romeka engaging in conduct he thought created a patient safety issue. On both days she was rushing the treatments and using the TrueBeam in such a way that its moving parts could have collided if not for software that detected a potential collision. After the treatments on May 10 and 11, Dr. Lerma told Ms. Romeka that "she was not delivering safe radiosurgery treatments."

By email on May 11, Dr. Lerma reported these events to Dr. Rosen under the subject line, "safety incidents Mercy SRS, Chief therapist[.]" He described the incidents in detail and concluded: "This new situation is a signaling at a significant safety risk. As chief physicist, I am writing to request to remove Ms. Romeka from treating on the [TrueBeam] until this can be further investigated as to the root cause of why she is rushing treatments."

On May 14, Dr. Rosen forwarded that email to David Spearman, President of RadAmerica, and wrote that he and Dr. Lerma had spoken that morning and Dr. Lerma was meeting with Ms. Greer that day. Sometime after May 11 but before May 17, Dr. Lerma spoke to Mr. Spearman, Mr. Osik, and Dr. Rosen, requesting clarification of

11

whether he could bar Ms. Romeka from participating in treatment if he thought that was necessary for patient safety. Mr. Spearman gave Dr. Lerma the authority to decide that a radiation therapist would not perform a procedure, or continue performing a procedure, for the safety of the patient. Dr. Rosen told Dr. Lerma, in a telephone conversation, that Dr. Lerma could prevent Ms. Romeka from participating in patient treatment.

### *Human Resources Investigation*

On Monday, May 14, Ms. Greer interviewed Dr. Lerma and most of RadAmerica's staff at the ROC, including Ms. Romeka. The interviewees, other than Ms. Romeka, corroborated the negative information about Ms. Romeka they had reported to Mr. Osik and Dr. Rosen. The radiation therapists described Ms. Romeka as "argumentative," "unorganized," "rushed," "unsafe," "nasty," incompetent, lacking in medical knowledge and technical skill, and a bully. Dr. Lerma reported that in the past six months he had noticed a change in Ms. Romeka's behavior in that "she's constantly rushing, seems anxious, fidgeting with equipment, not calm and things are left undone a lot." He described her as defensive, argumentative, unwilling to talk about issues that need to be discussed, and erratic. He expressed his concerns about Ms. Romeka's job performance, particularly with regard to patient safety, and described the incidents he had witnessed on May 10 and May 11.

In Ms. Greer's interview of Ms. Romeka, she denied engaging in any unsafe behavior and said the incidents of May 10 and 11 relayed by Dr. Lerma "didn't happen" and that he had been unwilling to speak with her. She said she did not remember an incident that Dr. Jacobs had discussed in which she (Ms. Romeka) had failed to perform

12

an administrative task and Dr. Jacobs had to do it herself. When asked about consent forms, Ms. Romeka said she "always gets consent to treat ahead of time," and that it is usually done by the front desk staff. Ms. Greer raised the issue of the credentialing of Fabjola Cangonji, one of the radiation therapists under Ms. Romeka's supervision. Ms. Romeka was responsible for completing all credentialing paperwork within a few weeks of a new therapist coming on board. More than a month had passed since Ms. Cangonji had been hired, but Ms. Romeka had not completed her credentialing paperwork. After meeting with Ms. Greer on May 14, Ms. Romeka completed Ms. Cangonji's credentialing documents but backdated them to May 11.

On Wednesday, May 16, Mr. Osik learned that the Patient Safety Event Report Ms. Romeka had submitted (at his request) about the missing patient consent form contained important substantive inaccuracies. Ms. Romeka had reported that the patient had started radiation treatment on April 30, not on April 9. She did not report that the patient underwent an entire course of radiation treatment without a signed consent form in his EMR. She named Dr. Jacobs as the only "involved party" in the oversight, failing to identify herself. Upon discovering these inaccuracies, Mr. Osik emailed Dr. Rosen that this was "another example of [Ms. Romeka]'s sloppiness and not taking responsibility as a leader."[12]

That afternoon (Wednesday, May 16), Ms. Greer "agreed with and confirmed the need to terminate Ms. Romeka" from employment "based on her conduct, performance,

---

[12] Mr. Osik emailed and spoke with Ms. Romeka the following morning and pointed out the inaccuracies.

and behavior." She notified Mr. Spearman—the final decision-maker on terminations from employment at RadAmerica—of her decision. It is not clear from Ms. Greer's affidavit that she notified Mr. Spearman that same day (May 16) or on May 17 or 18.

### *Directive by Mr. Spearman and Execution of Termination*

After Ms. Greer told Mr. Spearman of her termination recommendation, Mr. Spearman and Dr. Rosen discussed the fact that Ms. Romeka had falsified medical records with respect to the missing patient consent form, a serious offense that, as noted, militated against transferring her to another RadAmerica location instead of firing her. Mr. Spearman gave Dr. Rosen the okay to terminate Ms. Romeka's employment.

On Friday, May 18, Mr. Osik was eating lunch when Dr. Rosen stopped by and told him to proceed with the paperwork for Ms. Romeka's termination. Mr. Osik emailed Dr. Rosen at 4:09 p.m. that day saying he had informed Ms. Romeka by text message that she was to meet with him and Dr. Rosen at 9:00 a.m. on Monday, May 21, and she had replied, "Thank you." Mr. Osik also said in the email that he had told Scott Blackburn that, as of Monday, May 21, he was "Acting Chief[,]" *i.e.*, he was being moved into Ms. Romeka's position. Dr. Rosen responded that he would have "waited for the Scott part on Monday, but it is done."

Mr. Osik prepared the paperwork for terminating Ms. Romeka that same day (Friday, May 18) and on Sunday, May 20, Ms. Greer approved it. On the morning of Monday, May 21, Mr. Osik and Dr. Rosen met with Ms. Romeka in person and terminated her employment. The written "Notice of Corrective Action for Bridget Romeka" listed and described the incidents that formed the basis of her termination, including lack of

14

communication about patient safety, disrespect of staff and physicians, lack of integrity, unsatisfactory performance, and integrity/falsification of a medical record. It summarized the reason for termination as follows: "Your employment is terminated effective immediately for putting our patients at risk due to your lack of communication and falsification of a medical record."

### Alleged Protected Disclosure by Ms. Romeka on May 17

On Tuesday, May 15, Mr. Blackburn was treating a patient with the TrueBeam machine when he discovered that the motor in the treatment couch was not working.[13] He moved the treatment couch manually, which went smoothly. He reported the problem to Dr. Lerma that day and to Ms. Romeka the next day. (Ms. Romeka was off work on May 15.) Also that day, emails were exchanged between Dr. Lerma and Rod White, an employee of Varian, in which Mr. White said he had ordered the necessary replacement parts for the treatment couch motor and they would be installed at 4 p.m. the next day (Wednesday, May 16).

As it turned out, arrival of the replacement parts was delayed because they had to be shipped from Europe. On Wednesday, May 16, Ms. Romeka manually rotated the TrueBeam treatment couch while treating a patient. She did not raise a safety concern about Mr. Blackburn's having manually rotated the treatment couch the day before, or about having to do so herself that day. She did tell Mr. Osik that she had injured her hip

---

[13] Actually, one aspect of the motor was not working. The treatment couch moves in several directions. The part of the motor that controls circular movement of the treatment couch was not working. We shall refer to the failure generally as the motor not working.

15

while in the process of manually moving the treatment couch. According to Ms. Romeka, although she moved the treatment couch manually during patient treatment on May 16, the type of treatment being administered at the time did not require significant movement of the couch.

On Thursday, May 17, two brain tumor patients were scheduled for SRS treatments with the TrueBeam in the early afternoon. That morning, Ms. Romeka saw Dr. Lerma and raised concerns to him about SRS treatments being administered "with a broken couch." She mentioned the same thing to Dr. Jacobs, saying the treatments could not proceed "because the couch rotation was not working." She expected that the treatments would not go forward.

Drs. Jacobs and Lerma already had been discussing whether the SRS treatments for the two brain cancer patients would go forward. At first, they thought the treatments would need to be postponed. Dr. Jacobs was worried that any delay would cause problems for the patients, however. Both were in the process of receiving chemotherapy for their brain cancers which, for medical reasons, meant their SRS treatments could not be protracted. In addition, the patients were experiencing pain, which the SRS treatments would alleviate.

Dr. Jacobs asked Dr. Lerma to speak with the engineer at Varian about continuing to use the TrueBeam for treatments before the treatment couch motor was repaired. Specifically, she asked him to inquire whether there was any contraindication to using the TrueBeam for patient treatments when the motor in the treatment couch was not working. Dr. Lerma called and spoke with the Varian engineer, who explained that SRS treatments could be performed safely on patients by manually rotating the TrueBeam's treatment

16

couch.[14] Dr. Lerma communicated this to Dr. Jacobs, and they agreed that, from what the Varian engineer had said, the TrueBeam could be used safely for the two brain cancer patients. Dr. Jacobs was the final decision-maker as to whether the treatments would happen that day. Based on her own knowledge about the patients' conditions and their need for treatments and the Varian engineer's opinion that the SRS treatments could be safely administered with the treatment couch being moved manually, Dr. Jacobs decided that the treatments would go forward. She assigned Dr. Lerma the task of moving the treatment couch manually during those treatments.[15]

Also on the morning of Thursday, May 17, Dr. Lerma told Dr. Jacobs that he was planning to keep Ms. Romeka out of the two brain cancer SRS treatments. He explained about having obtained authority from his RadAmerica superiors to keep a therapist out of treatment for patient safety reasons, and asked whether Dr. Jacobs would be supportive. According to Dr. Lerma, she approved his keeping Ms. Romeka from participating in the treatment of the two brain cancer patients. Dr. Lerma was of the view that keeping Ms.

---

[14] Dr. Lerma testified: "[The Varian engineer] explained to me that the table could rotate without harming any other aspects of its accuracy or integrity, that we were not going to damage the motor, because the motor was already not working, and that we can just push the table to the next angle. Since the table does not move after it, there's no risk of it drifting or anything, that we can then use it for treatment."

[15] In deposition, Ms. Romeka testified that she knew, from the ROC calendar, that Dr. Jacobs was scheduled to go on a vacation to Italy the following week. She surmised that Dr. Jacobs decided that the brain cancer patients would be treated on May 17 so she would not miss her vacation. However, there is no evidence in the record as to when the TrueBeam treatment couch was expected to be repaired; when in fact it was repaired; or that if the patients had been scheduled for treatments the following week, they would not have received the treatments in Dr. Jacobs' absence. This testimony is too conjectural to consider.

17

Romeka from treating the patients on May 17 had nothing to do with manual operation of the treatment couch but was based on her having administered treatment to patients in an unsafe manner.

According to Dr. Lerma, he then told Ms. Romeka that she would not be participating in the treatments for the two brain cancer patients and if she had a question, to call Dr. Rosen or Mr. Osik. Ms. Romeka did not respond to Dr. Lerma. She did contact Dr. Jacobs and Dr. Rosen, however, asking why she was not to be permitted to treat patients. She told Dr. Jacobs she did not "think pushing the couch for an SRS treatment is a good idea." Dr. Rosen took her phone call to be an inquiry about her employment status and responded that she still was the chief radiation therapist in the ROC.

Despite being told she would not be participating in the patient treatments on May 17, Ms. Romeka went to the treatment room. Dr. Lerma blocked her from entering. She entered the control room immediately outside the treatment room, from which treatments may be observed, and stayed there. Dr. Jacobs was in the control room and Dr. Lerma was in the treatment room.

Drs. Jacobs and Lerma testified in deposition that during the treatments of the brain cancer patients, Ms. Romeka did not express any concern about the manual rotation of the treatment couch or about the safety of the patients. Her only comment was about the selection of the music being played inside the treatment room. None of the other five medical staff present during the treatments expressed any concern about patient safety, although each was authorized to pause the treatment temporarily to let a doctor determine

18

what to do next if a problem were perceived. Ms. Romeka did not ask that the treatment be paused.

In his deposition, Dr. Lerma described the manual movement of the treatment couch during the May 17 treatments as "smooth," with no movement by either patient. Dr. Jacobs testified that "the treatment [on May 17] went very smoothly despite the fact that we introduced the manual movement of the couch in the practice."

In her deposition, Ms. Romeka testified that as she was watching the SRS treatments to the first brain cancer patient, she noticed the patient move out of position. After that patient's treatment was finished, she asked that a confirmatory CT image be taken to ensure that the radiation therapy had been accurately delivered. Her request was ignored. The other people in the treatment room at that time testified that they did not see the patient move; none of them recalled Ms. Romeka's saying she thought the patient had moved. Mr. Blackburn testified that he had "a direct line of sight on both patients at all times during the manual rotation of the treatment couch" and "[a]t no time" did he see either patient move. Dr. Jacobs testified that she watched the patients as they were being treated and had no concern that the manual rotation of the treatment couch had caused any patient movement.[16]

Ms. Romeka further testified in deposition that after the treatment sessions concluded on the afternoon of Thursday, May 17, she told Dr. Jacobs she was going to file a grievance "about what I just witnessed in the clinic[.]" She then texted Mr. Osik and

---

[16] Nothing in the summary judgment record suggests that at a later time it was determined that this patient's SRS treatments were not properly administered.

asked him to call her, which he did. Ms. Romeka testified as follows about that call, which

is the oral protected disclosure she bases this lawsuit on:

> I told Mr. Osik that I was not allowed to treat, which he was unaware of. I told him that they treated two patients on the broken machine. And I told him I just witnessed the most unprofessional thing I've ever seen in twenty-five years, two physicists pushing - - manually pushing a machine for an SRS treatment. And I asked to file a grievance.

She testified that she would need to meet with him and Dr. Rosen about this grievance and

told him she could do so the next morning.

> At 7:47 a.m. the following morning, Friday, May 18, Mr. Osik emailed Dr. Rosen:

> FYI.
> I called [Ms. Romeka] after our meeting yesterday. She was very upset in the manner in which she was treated by [Dr. Lerma] in regards to not treating the SRS patients yesterday.
> She informed me that in front of other staff [Dr. Lerma] stated that Scott [Blackburn] and Fabjola [Cangonji] was going to treat the patients. Heather [another radiation therapist] stated "what am I chopped liver".
> When [Ms. Romeka] went to go into the room "[Dr. Lerma] put is [sic] hand in front of my face and said we got this".
> She was very upset and crying.

In his deposition, Mr. Osik testified that he had understood Ms. Romeka's expressed

concern on May 17 to be about what she considered unprofessional conduct by Dr. Lerma

in manually moving the treatment couch during the SRS treatments. He did not tell Mr.

Spearman, Ms. Greer, or Dr. Rosen that Ms. Romeka had complained to him on May 17

about the treatment couch being used. Dr. Rosen testified that he had no recollection of

Mr. Osik saying anything to him about a complaint by Ms. Romeka concerning use of the

treatment couch.

Further in her deposition, Ms. Romeka testified that on the morning of Friday, May 18, she went to Mr. Osik's office. She thought that Dr. Rosen would be there, but he was not. She spoke to Mr. Osik about filing a grievance and said she was upset about "the way they treated two patients with a broken machine." Ms. Romeka said she still wanted to meet with him and Dr. Rosen about filing a grievance and that she felt sick about what had happened. Mr. Osik told her to take the rest of the day off as a sick day.

Later that day, Mr. Osik texted Ms. Romeka to say he and Dr. Rosen would meet with her on Monday, May 21, at 9:00 a.m. Ms. Romeka testified that she thought the purpose of that meeting was for her to file a grievance. After meeting with Mr. Osik on Friday, May 18, she texted Mr. Blackburn, saying she had not been fired. Mr. Blackburn had been telling her he thought she was going to lose her job.

### Termination from Employment

Ms. Romeka met with Dr. Rosen and Mr. Osik as scheduled on the morning of Monday, May 21. Mr. Osik told her that she was terminated from employment and gave her the reasons, as set forth in the termination papers. She asked if she could resign instead. Dr. Osik simply reiterated that she was terminated from employment as of that day.

Ms. Romeka did not prepare or file a written grievance or safety complaint about the use of the TrueBeam with a broken treatment couch at any time either before or after she was terminated from employment. In deposition, she testified that she thought the purpose of the May 21 meeting was to put together a written grievance for her to submit, and that is why she did not prepare one. In supplemental answers to interrogatories, Ms. Romeka attested that "around August [of] 2019" she contacted the State of Maryland's

21

Radiation Safety Officer who confirmed that using the TrueBeam with a broken treatment couch violated Maryland regulations, which require that radiation devices that are not fully operable be removed from service.

* * *

In summary, from May 1 through May 16, two investigations were conducted into problems with Ms. Romeka's competency and treatment of others at work, and of her falsification of a patient's EMR. All people with knowledge criticized Ms. Romeka, except Ms. Romeka herself. Ms. Romeka's problematic conduct continued while the investigations were being carried out. On May 10, Dr. Rosen and Mr. Osik decided Ms. Romeka should be fired, and on May 16, Ms. Greer decided to recommend termination as well. On May 17, when the motor on the treatment couch of the TrueBeam was broken, Ms. Romeka was barred from treating two patients, but observed. Viewed in a light most favorable to Ms. Romeka, she communicated during the treatments that one patient had moved, but was ignored; after the treatments, she orally complained to Mr. Osik that the TrueBeam had been used to treat the two patients even though the treatment couch was broken; and a meeting was scheduled for May 21, at which she thought she was going to be filing a written grievance based on that complaint. Instead, she was fired. Also viewed in a light most favorable to Ms. Romeka, Mr. Spearman's final decision to terminate her employment was made on the morning of May 18 - - after (not before) Ms. Romeka had made her protected disclosure to Mr. Osik. There is no evidence that Mr. Spearman (or Drs. Rosen or Jacobs) knew of Ms. Romeka's complaint to Mr. Osik. Immediately after she was terminated, Ms. Romeka asked to resign instead, but was not permitted to.

22

On May 8, 2019, Ms. Romeka filed suit in this case. She amended her complaint twice, with the operative second amended complaint being filed on August 5, 2019. That complaint consisted of a single count, alleging unlawful termination in violation of the HCWWPA.

At the close of discovery, RadAmerica moved for summary judgment on two grounds. First, it argued that Ms. Romeka could not adduce evidence that she had made a written complaint, based on a reasonable, good-faith belief that RadAmerica had engaged in a violation of law, rule, or regulation, or that its conduct posed a substantial risk to public health. Second, it argued that on the undisputed material facts, RadAmerica's decision to terminate Ms. Romeka's employment was made before Ms. Romeka's allegedly protected activity under the HCWWPA, and therefore the termination was for "legitimate, non-retaliatory reasons" and was not caused by the alleged protected activity, as a matter of law.

Ms. Romeka filed an opposition in which she took the position that her termination on May 21 was an act of reprisal for her May 17 verbal complaint to Mr. Osik about the treatment couch being used when its motor was broken. She asserted that her complaint concerned patient safety. She argued that the HCWWPA does not contain an "absolute writing requirement" in the making of such a complaint, so it did not matter that her complaint was not in writing, and that she could provide evidence "for every element" of her action. She further asserted that RadAmerica's not permitting her to resign in lieu of termination created another basis for liability under the HCWWPA.

23

The circuit court heard argument on RadAmerica's motion on November 25, 2020. RadAmerica's attorney maintained that the material facts were undisputed that Ms. Romeka was terminated on May 21 "for losing a patient consent form, and falsifying that patient's medical record, and for significant ongoing interpersonal issues with her coworkers." Despite "those well-documented bases for her termination[,]" counsel continued, Ms. Romeka was maintaining that she was fired in retaliation for reporting a patient safety concern, even though she "had failed to present a single shred of evidence that she actually complained in good faith about patient safety, or objected to the operation of the TrueBeam at any time prior to her termination, as is required by the Act."

Accusing Ms. Greer of committing perjury in her affidavit setting forth the timeline of events leading to Ms. Romeka's termination, Ms. Romeka's attorney countered that Ms. Romeka's termination was a pretextual reprisal for her protected activity of disclosing "a significant and serious patient safety concern[.]"

The circuit court judge ruled that the undisputed material facts showed that RadAmerica was "acting on very substantial complaints" about Ms. Romeka's conduct—including her handling of the missing patient consent form, her supervisory ability, her manner of working, and her skills as a clinician—and had taken "very substantial and serious steps toward employment action, well before any possible complaint by Ms. Romeka was made that related to patient health or safety." Moreover, it was undisputed that Ms. Romeka knew that the motor in the TrueBeam treatment couch was not working before May 17, but did not make a complaint about patient safety, in fact manually rotating the couch herself for treatment on May 16. The court determined that RadAmerica's

24

decision to terminate Ms. Romeka, rather than permit her to resign, was not, as a matter of law, a separate employment action subject to the protections of the Act.

The judge concluded his ruling as follows:

> Again, let me emphasize that my conclusion here is not to say that all of the factual disputes that exist in this case can be swept aside as undisputed facts. There are an abundant number of disputes in this case. But I concluded that what the defendant has done is on the issue of causation, the critical issue of causation, the defendant has demonstrated without dispute that the defendants were, in fact, in process of terminating Ms. Romeka for reasons other than any conceivable complaint about patient health or safety because it preceded in time any possible such complaint.

> So that even if I were to resolve the factual disputes in favor of the plaintiff for the fact that she did make a complaint, and that that was her purpose in challenging her exclusion from the treatment room on the afternoon of May 17th, even if I were to indulge her in the possibility that a jury could believe her on that point, it would not amount to causation overcoming what the defendants were already doing in terms of their investigation and their consideration of her status as an employee.

> So for all those reasons I conclude that the defendants are entitled to judgment as a matter of law on the narrow set of facts that they have established without dispute, and that the plaintiff would be unable, as a matter of law, to prove causation as required under the statute.

> And therefore it's appropriate to grant summary judgment to the defendants on all claims at this point.

The court incorporated its oral ruling into a written order of November 25, 2020.

Ms. Romeka timely filed her notice of appeal.

We shall include additional facts as necessary to our discussion of the issues.

## STANDARD OF REVIEW

Summary judgment properly may be granted when the material facts in a case are not subject to genuine dispute and the moving party is entitled to judgment as a matter of

law.  Md. Rule 2-501(f).  A genuine dispute of material fact exists only when there is evidence on which a reasonable jury could base a verdict in favor of the non-moving party. *Brawner Builders, Inc. v. State Highway Admin.,* 476 Md. 15, 31 (2021).

The decision to grant a motion for summary judgment is one of law, which we review *de novo*.  *Asmussen v. CSX Transp., Inc*., 247 Md. App. 529, 558 (2020).  "'We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.'"  *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 632-33 (2018) (quoting *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482 (2017)).  "So long as the record reveals no genuine dispute of any material fact 'necessary to resolve the controversy as a matter of law, and it is shown that the movant is entitled to judgment, the entry of summary judgment is proper.'"  *Appiah v. Hall*, 416 Md. 533, 547 (2010) (quoting *O'Connor v. Balt. Cnty.*, 382 Md. 102, 111 (2004)).

## ISSUES

The issues for review are whether the circuit court was legally correct in ruling, on the summary judgment record, that: 1) Ms. Romeka could not prevail in an action under the HCWWPA due to lack of evidence of causation; and 2) RadAmerica's refusal to allow Ms. Romeka to resign immediately after she was fired is not actionable under the HCWWPA.[17]

---

[17] As phrased by Ms. Romeka, her questions presented are:

(Continued)

26

## DISCUSSION

## I.

## Causation

As the circuit court judge commented in his ruling, there is no shortage of disputes of fact and law in this case.[18] The court limited its grant of summary judgment primarily to the issue of causation under the Act, however, rendering disputes unrelated to causation immaterial.

Ms. Romeka contends that, from the evidence in the summary judgment record viewed in a light most favorable to her, reasonable jurors could find that she was fired on May 21 in reprisal for complaining to Mr. Osik on May 17 that the TrueBeam was used when it was in a state of disrepair. She argues that to prove causation, she only would need

---

1. Is it reversible error upon summary judgment for the trial court to ignore ambiguous evidence, fail to construe inferences for the non-moving party and so hold whistleblowing to be zero motivating factor in Ms. Romeka's firing, because it would have happened anyway?
2. Should the court below ignore pretext to avoid permitting trial?
3. Is it legal error to deem an unusual "refusal of a personnel action of resignation" as too far-fetched to be legally cognizable under the Maryland Health Care Worker Whistleblower Protection Act?

[18] Among others, there are disputes over the substance of Ms. Romeka's complaint to Mr. Osik on May 17, and whether her complaint was a protected disclosure within the meaning of the Act; over when Mr. Spearman made the final decision to fire Ms. Romeka; over whether one of the SRS patients treated on May 17 moved during the treatment; and over whether an oral complaint is sufficient to receive the protection of the Act, under HO § 1-503(3). As noted in our discussion, we are viewing the facts in the light most favorable to Ms. Romeka. So, for example, we refer to her complaint of May 17 as a protected disclosure, even though whether it qualified as such under the HCWWPA is disputed. We do not address disputed issues of law unless they formed a basis for the summary judgment ruling.

27

to show that her protected disclosure was a "motivating factor" in the decision to terminate her employment, not that it was the but-for cause of her termination. She argues that in granting summary judgment, the circuit court judge failed to apply the correct standard of causation and failed to view the facts in a light most favorable to her. Not surprisingly, RadAmerica contends the court was legally correct in its ruling on causation and in its assessment of the evidence in the summary judgment record.

The standard of proof for causation in cases brought under the HCWWPA has not been addressed by any appellate court in a reported opinion. The critical causation language in the Act prohibits an employer from taking or refusing to take "any personnel action as reprisal against an employee **because** the employee" made a protected disclosure (among other things). HO § 1-502 (emphasis added). In the context of employment law, this is classic anti-retaliation language. Described generally, retaliation cases consist of three elements: 1) a protected activity by an employee; 2) an adverse personnel action by the employer against the employee; and 3) a causal connection between the protected activity and the adverse action. *See e.g.*, *Taylor v. Giant of Md.*, 423 Md. 628, 658 (2011); *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 349 (2000).

### *Causation in Federal Title VII Retaliation Cases*

Federal cases addressing Title VII of the Civil Rights Act of 1964 are persuasive authority in interpreting Maryland employment discrimination laws, including those that prohibit retaliation. *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494 (1990). Although in disagreement generally, the parties to the case at bar concur that the evidentiary

28

framework for Title VII cases established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs the order and allocation of proof here.

Under the *McDonnell Douglas* framework, the plaintiff first must produce evidence to support a prima facie case. If the plaintiff does so, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason (or reasons) for the adverse employment action. Finally, if the defendant makes that showing, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was a pretext for discrimination, *i.e.*, was not the actual reason for the adverse employment action. *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015). The *McDonnell Douglas* burden shifting paradigm has been applied in employment discrimination actions where there is no direct evidence of discrimination. *Id.*

Title VII of the Civil Rights Act includes, at 42 U.S.C. § 2000e-2, provisions prohibiting discrimination in employment based on certain individual traits or characteristics; and, at § 2000e-3, other forms of employment discrimination, including, at subsection (a), retaliation against an employee for protected activity. Under § 2000e-3(a), protected activity includes opposing a practice prohibited by Title VII and making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a sex discrimination case under § 2000e-2(a)(1)—not a retaliation case—the U.S. Supreme Court addressed the standard of proof for causation when the plaintiff was fired for illegitimate (gender-based) **and** legitimate reasons. At the time, the controlling statutory language made it an

"unlawful employment practice for an employer . . . to discriminate against any individual . . ., **because of** . . . sex[.]" *Id.* at 262 (emphasis added). In a plurality decision, the Court held that the "because of" criterion is satisfied when the plaintiff proves, by a preponderance of the evidence, that the motive to discriminate was one of the employer's motives for taking the employment action, even if there were other lawful motives. In other words, in such a "mixed-motive" case, discriminatory animus need not be the but-for cause of the employment action. The Court was badly fractured on the nature and order of proof necessary to satisfy the "motivating factor" standard of causation, however.

Congress responded to *Price Waterhouse* by enacting the Civil Rights Act of 1991, which added 42 U.S.C. § 2000e-2(m) to Title VII. Under that subsection, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin **was a motivating factor** for any employment practice, even though other factors also motivated the practice." (Emphasis added.) The statute further provides that in an action under that section, when the plaintiff makes such a showing, the burden shifts to the defendant to show it would have taken the same employment action in the absence of any discriminatory animus. If the defendant does so, the plaintiff still has remedies, but they are limited.

Since the turn of the new century, the Supreme Court has addressed causation in Title VII actions twice. In *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), which, like *Price Waterhouse*, was not a retaliation case, it held that circumstantial evidence is sufficient to prove motivating factor causation in an action under § 2000e-2(m). More pertinent to the case at bar, in *University of Texas Southwestern Medical Center v. Nassar*,

30

570 U.S. 338 (2013), the Court held that the motivating factor standard of proof of causation that applies to cases under § 2000e-2(m) does not apply to retaliation cases under § 2000e-3(a).

The *Nassar* Court described actions under § 2000e-2(m) as "status based" discrimination cases, *i.e.*, those in which the complaining party claims to have been subjected to an unlawful employment practice based on a personal trait or characteristic such as sex, race, gender, nationality, *et al*. It explained that, beginning with the principle announced in *Price Waterhouse* and later codified in the 1991 amendment to the Civil Rights Act, causation in status-based Title VII cases may be proven by evidence that discriminatory animus was a motivating factor for the employment action. The Court never had addressed the question whether this "lessened causation standard," that is, a standard short of "but-for" causation, applies to retaliation claims under § 2000e-3(a). 570 U.S. at 343.

As noted, § 2000e-3(a) makes it an unlawful employment practice for an employer to take an adverse employment action "because" an employee opposed a practice made unlawful under Title VII, or made a charge, or took other action permitted by Title VII. In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Court had addressed causation in analyzing similar anti-retaliation language in the Age Discrimination in Employment Act of 1967 ("ADEA"). There it had held that the "'because of'" anti-retaliation language in the ADEA means "'by reason of'" or "'on account of[,]'" and therefore age must be shown to have been the but-for cause of the employer's decision. *Id*. at 176.

31

The *Nassar* Court concluded that the plain language of § 2000e-3(a)(1), prohibiting retaliation against an employee "because" the employee engaged in a protected activity, requires, as it does in the ADEA, proof of but-for causation. For that reason, unlike status-based claims under § 2000e-2, the motivating factor standard of causation does not apply to retaliation claims. The Court expressed concern that applying a more lenient standard than but-for causation to retaliation claims would have a negative effect on "the fair and responsible allocation of resources in the judicial and litigation systems." 570 U.S. at 358. In particular, it would tempt employees who believe they are about to experience an adverse employment action to "forestall that lawful action" by making unfounded charges of discrimination on which to base a retaliation claim when the action happens. *Id*. A lesser standard of causation would lead to litigation that would be difficult to resolve short of trial and would raise the "financial and reputational" costs on employers "whose actions were not in fact the result of any discriminatory or retaliatory intent." *Id*. at 359.

In 2015, in *Foster v. Univ. of Maryland-Eastern Shore*, *supra*, the Fourth Circuit confronted the question whether the standard of proof for causation that had developed over years of applying the *McDonnell Douglas* burden-shifting framework to retaliation cases satisfies the holding in *Nassar*. The court explained that when that framework is applied to retaliation cases, which is a usual occurrence, as most cases lack direct evidence of retaliatory animus, the plaintiff must prove causation twice. First, in making out a prima facie case, the plaintiff must show that 1) she engaged in a protected activity; 2) the employer took an adverse action against her; and 3) **there is a causal connection** between the two. Traditionally, the proof of causation deemed acceptable at the prima facie stage

32

of the *McDonnell Douglas* evidentiary paradigm has been more relaxed than but-for causation. That is reasonable, the court stated, because "[i]f plaintiffs can prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis." 787 F.3d at 251. *See also Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018) ("establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden.").

The *Foster* court went on to explain that if the defendant then produces evidence showing that it took the employment action at issue for legitimate non-retaliatory reasons, the burden shifts to the plaintiff to prove pretext, *i.e.*, that the supposedly non-retaliatory reasons for the adverse action "'were not its true reasons, but were a pretext for discrimination.'" 787 F.3d at 250 (quoting *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004)). Significantly, the court reasoned that this is the same as proving but-for causation. The plaintiff must show "that retaliation was the actual reason for the challenged" action, that is, that "'both … the employer's reason was false and that retaliation was the real reason for the challenged conduct.'" *Id*. at 252 (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (brackets omitted). The necessary proof that retaliation "'was the real reason for the [employment action],'" (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)), is the "functional[] equivalent" of proving but-for causation, *i.e*., that the termination would not have happened but for the employer's "'retaliatory animus[.]'" *Id*. The court concluded that because proof of pretext in cases employing the *McDonnell Douglas* framework is

33

tantamount to proof of but-for causation, the holding in *Nassar* is satisfied when that framework of proof is used in a retaliation case.

In *Lewis v. Baltimore City Board of School Commissioners*, 187 F.Supp.3d 588 (D. Md. 2016), the court applied the Fourth Circuit's holding in *Foster* in granting summary judgment to the defendant employer in a Title VII retaliation case. While employed as the vice principal of a middle school, the plaintiff made a sexual harassment complaint against the school principal. The plaintiff was removed as vice principal and assigned to a teaching position, which she considered to be a demotion. She alleged that this was an adverse employment action taken by the defendant as reprisal for her having made the sexual harassment complaint. *Id.* at 592-93.

The court first considered the causation evidence in the summary judgment record in the context of the plaintiff's prima facie case. It observed:

> In evaluating causation at the prima facie stage of the retaliation analysis, courts often consider: (1) whether the allegedly retaliatory actor was aware that the plaintiff had engaged in the protected activity at the time of the allegedly retaliatory act, and (2) the temporal proximity between the protected activity and the allegedly retaliatory act.

> ***

> In order for temporal proximity alone to satisfy the causation prong of the prima facie case, the temporal proximity must be very close.

*Id.* at 596-97.

The court determined that the evidence on the summary judgment record would not allow a reasonable factfinder to find the causation element of a prima facie case, for two reasons. First, the evidence established that the person who made the decision to transfer

34

the plaintiff did not know that the plaintiff had made a complaint about sexual harassment. Second, the six-month period from the date of the plaintiff's sexual harassment complaint to the date of her change in position was too long to establish temporal proximity, as a matter of law. *Id.* at 597.

Nevertheless, the court further determined that even if the plaintiff had made out a prima facie case, the defendant still would be entitled to summary judgment. The defendant's evidence showed that the plaintiff was transferred from one position to the other due to the needs of the school system and that she had failed to meet the performance expectations for vice principals. As such, the defendant "satisfied its burden of providing a legitimate non-retaliatory reason for its allegedly retaliatory acts." *Id.* The burden shifted to the plaintiff to show that the defendant's reasons for reassigning her were pretextual and that "'retaliation was a but-for cause of [the] challenged adverse employment action.'" *Id.* (quoting *Foster*, 787 F.3d at 252). The court concluded:

> Although [the plaintiff] has generally asserted that the [defendant]'s actions were retaliatory, she has offered no specific facts to support her assertions. In fact, the evidence demonstrates that in response to [her] sexual harassment complaint . . . the [defendant] took disciplinary action against [and demoted the harasser]. Additionally, [the plaintiff] has not shown that the basis for the negative evaluation was false. [She] admitted that she submitted incomplete formal observations, and in her annual evaluation, [her superior] cited [the plaintiff]'s lack of feedback as a primary reason for her unsatisfactory rating. Viewing all of the evidence in the light most favorable to [the plaintiff], she cannot establish that, but for the [defendant]'s retaliatory motives, she would not have been issued a negative evaluation and reassigned from an administrative position to a teaching position.

*Id.* (internal record references removed).

### *Maryland Wrongful Discharge, Discrimination, Retaliation, and Whistleblower Statute Cases*

In *Molesworth v. Brandon*, 341 Md. 621 (1996), the Court of Appeals, noting that a myriad of Maryland statutes establish a clear mandate of public policy against employment discrimination based on sex, held that an at-will employee who had no State or federal statutory remedies and was fired based on her gender, could sue in tort for wrongful discharge, under the principles set forth in *Adler v. American Standard Corp.*, 291 Md. 31 (1981). The Court also addressed the propriety of certain jury instructions the trial court had given, including the following instruction on causation:

> The Plaintiff must prove the Defendant intentionally discriminated [against] the Plaintiff. That is, but for[] the Plaintiff's gender the Defendant would not have made the decision not to continue the Plaintiff's employment.

*Molesworth*, 341 Md. at 645.

The Court held that this instruction adequately described the burden of proof in a sex discrimination case. In a footnote, however, it said the following about the Supreme Court's decision in *Price Waterhouse*:

> The plurality decision in *Price Waterhouse* . . . ruled that "[t]o construe the words 'because of' as a colloquial shorthand for 'but-for causation,' . . . is to misunderstand them."
>
> > . . . Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore, an employer considers both gender and legitimate factors at the time of making a decision that decision was "because of" sex and the other, legitimate considerations – even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account.

*Id*. at 645 n.8 (quoting *Price Waterhouse*, 490 U.S. at 240-41).[19]

The defendant in *Molesworth* did not maintain that he had fired the plaintiff for some reason other than her gender. And, unlike in most cases involving discrimination, the plaintiff was relying upon direct evidence - - oral statements by her employer witnessed by others - - that she was terminated because of her gender.[20]

Over a decade later, this Court and the Court of Appeals addressed causation in a retaliatory discharge action brought under Montgomery County Code, Part II, § 27-19(c). *See Gasper v. Ruffin Hotel Corp. of Maryland, Inc.*, 183 Md. App. 211 (2008), *aff'd, Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594 (2011).[21] The plaintiff, a hotel

---

[19] In reviewing the use of another jury instruction, the Court discussed the burden shifting paradigm established for Title VII cases in *McDonnell Douglas*. The instruction, known as "the same actor inference," stated that jurors could draw an inference against gender being the reason for the plaintiff's termination from employment if they found that the same person who fired her had hired her to begin with. The Court held that this type of instruction would be relevant, if at all, only in assessing pretext evidence in a case being tried under *McDonnell Douglas*. Because the plaintiff in *Molesworth* was relying on direct evidence of discrimination, the *McDonnell Douglas* framework did not apply, and the instruction was improper.

[20] The plaintiff was employed by the defendant as a veterinarian and was assigned to treat racehorses owned by particular clients. The defendant fired her because he thought those clients did not want a female veterinarian to treat their horses.

[21] Title 20 of the State Government Article, which prior to 2009 was Article 49B of the Maryland Code, codifies certain Maryland anti-discrimination laws. It includes the Fair Employment Practices Act ("FEPA"), which prohibits discrimination on the basis of sex, including retaliation against an employee for opposing a discriminatory practice. Md. Code (1984, 2021 Repl. Vol.), § 20-606(f) of the State Government Article. Before 2007, the only means to obtain a remedy for a claim of discrimination under the FEPA was to file a charge with the Maryland Commission on Human Relations. A 2007 amendment to that law allows a private civil action, including an action for violation of certain county anti-discrimination laws, such as the Montgomery County law in the *Gasper* case.

37

employee, complained in writing to her supervisor, his supervisor, and the owner and CEO that another employee had sexually assaulted and harassed her. She then was fired. She sued, alleging, among other things, that she was retaliated against for having made a sex discrimination complaint. The defendant responded that it had fired her because she treated hotel staff so badly that they had made complaints against her; she isolated herself, slammed doors, and acted in such a way that the hotel guest satisfaction surveys suffered; and she was hostile and insubordinate to one of her superiors. 418 Md. at 599-605.

At trial, the court instructed the jury that to prevail on her retaliation claim the plaintiff had to prove that she had opposed practices of the defendant that she reasonably and in good faith believed were unlawful harassment; that she was discharged; and that her opposition to the harassing conduct "was a determining factor in the decision to discharge her*." Id*. at 607 (quotation marks and emphasis omitted). The plaintiff excepted to the instruction, arguing that she only had to prove that her opposition to the harassing conduct was "a 'motivating factor'" in the decision to discharge her. After losing at trial, the plaintiff appealed, challenging the "'determining factor'" jury instruction. *Id.* at 607-08.

This Court reversed, holding that the instruction was legally incorrect. We discussed *Price Waterhouse* (as quoted in the *Molesworth* opinion) and the Supreme Court's opinion on causation in *Desert Palace, Inc. v. Costa*, neither of which were retaliation cases. Our holding stated, however: "We believe Maryland law to be settled that a plaintiff's burden is to prove that the exercise of his or her protected activity was a 'motivating' factor in the discharge, **thereby creating burden-shifting to the defendant.**" 183 Md. App. at 222 (emphasis added). The Court of Appeals affirmed on the same basis.

38

418 Md. at 614. Although the *McDonnell Douglas* paradigm was not a topic of discussion in either opinion, the "burden-shifting" language in the opinion of this Court makes clear that the standard of causation at issue was applicable in a prima facie case under that paradigm. [22],[23]

Maryland's Whistleblower Statute, Md. Code (1993, 2015 Repl. Vol., 2021 Supp.), § 5-305 of the State Personnel and Pensions Article ("SPP"), affords protection to certain

---

[22] Both Courts rejected the argument that the motivating factor standard for causation applies only in mixed-motive, not retaliation, cases. This is the same argument the Supreme Court later adopted in *Nassar*. Likewise, both Courts cited *Magee v. DanSources Technical Services*, 137 Md. App. 527, 565-66 (2001), which, in using a motivating factor standard in a retaliation case, cited *Price Waterhouse*—not a retaliation case.

[23] Since the Court of Appeals' *Gasper* decision in 2011, this Court has reported several opinions in employment discrimination cases brought pursuant to the FEPA and the Montgomery County Code. They have not directly concerned the standard of proof of causation. In *Edgewood Management Corp. v. Jackson*, 212 Md. App. 177 (2013), a gender discrimination retaliation action, we upheld a jury verdict in the plaintiff's favor, rejecting, among other arguments, that the evidence was legally insufficient to prove a prima facie case. *Id.* at 203. We held that even though the supervisor who made the decision to terminate the plaintiff's employment did not know about her protected activity, the employer could be liable if the plaintiff showed that the adverse employment action was influenced by another superior employee who knew of it and was motivated by gender-based animus. *Id.* at 205.

In *Lockheed Martin Corp. v. Balderrama*, 227 Md. App. 476 (2016), we reversed a judgment entered on a jury verdict in favor of a plaintiff who alleged that he was fired for complaining that his negative performance reviews were based on race and national origin discrimination. *Id.* at 482. After that, the company effected a large-scale reduction in force ("RIF") for budgetary reasons, and the plaintiff was laid off in the RIF. *Id.* at 498. We held that even assuming the evidence was sufficient to prove a prima facie case, the plaintiff had put on legally insufficient evidence to show pretext, *i.e.*, that the RIF was not the reason he was terminated and discrimination was the real reason for the termination. To prove pretext, the plaintiff must introduce factual evidence to disprove the reasons given for the adverse employment action. *Id.* at 515-16.

39

State employees. In *Department of Natural Resources v. Heller*, 391 Md. 148 (2006), the Court of Appeals addressed the question whether an administrative law judge properly found that a claimant had made a protected disclosure under that statute. The claimant alleged that he was disciplined as reprisal for making a disclosure protected by the statute. *Id.* at 152. The pertinent statutory language prohibits a supervisor (among others) from "tak[ing] or refus[ing] to take any personnel action as a reprisal against an employee who . . . discloses information that the employee reasonably believes evidences . . . an abuse of authority, gross mismanagement, or gross waste of money[,]" "a substantial and specific danger to public health or safety[,]" or "a violation of law[.]" *Id.* at 168.

Observing that there was no Maryland case law interpreting the Whistleblower Statute and that its language is similar to that in whistleblower provisions of the federal Civil Service Reform Act of 1989, the Court looked to federal interpretations of that law for guidance. Speaking in general terms, the Court explained that the elements of a retaliation claim under SPP § 5-305 are a protected disclosure evidencing an intent to raise an issue with an authority who has the power to correct it; an adverse personnel action; and a causal connection between the two. The Court stated:

> A whistleblower action by the employee intended to overturn a personnel action also will succeed only if the employee shows by a preponderance of the evidence that the protected disclosure was a "contributing factor" in the decision to take the personnel action. *See Willis* [*v. Dept. of Agric.*, 141 F.3d 1139,] 1143 [(Fed. Cir. 1998)]; [SPP] § 5-302 … ("This subtitle does not prohibit a personnel action that would have been taken regardless of a disclosure of information."). In this regard, the evidentiary requirements of a whistleblower action utilize the burden-shifting paradigm applicable to employment discrimination claims as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

40

*Id.* at 171.

The "contributing factor" language the Court quoted from *Willis v. Department of Agriculture* comes from 5 U.S.C. § 1221, which establishes procedures and standards for proving certain federal whistleblower reprisal cases, including under the Civil Service Reform Act of 1989. Section 1221(a) allows a claimant to seek corrective action from a designated board for personnel actions taken as a result of a proscribed practice. Under § 1221(e)(1), the board shall order appropriate corrective action if the claimant "has demonstrated that a disclosure or protected activity . . . was a contributing factor in the personnel action which was taken[.]" Under § 1221(e)(2), however, the board may not order corrective action if, after making the contributing factor finding, the defendant agency "demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure."

The *Heller* Court held that the claimant had not made a protected disclosure under the Maryland Whistleblower Statute. Accordingly, it did not address the issue of causation.

### *Analysis*

We agree with the parties that the *McDonnell Douglas* evidentiary framework applies to this case, for two reasons. First, it is a defense to an action under the Act "that the personnel action was based on grounds other than the employee's exercise of any rights protected under th[e Act]."[24] HO § 1-506. This defense, on which the defendant bears the

---

[24] In her brief, Ms. Romeka makes arguments that concern other elements of a claim for retaliation under the HCWWPA. For example, on the protected activity element, she

(Continued)

burden of proof, meshes with the *McDonnell Douglas* framework's requirement that, once the plaintiff puts on a prima facie case, the burden shifts to the defendant to produce evidence that its allegedly retaliatory employment action in fact was taken for a legitimate non-retaliatory reason. Second, in a case such as this, where there is no direct evidence that RadAmerica fired Ms. Romeka because she complained about it using a broken machine for patient treatment, retaliatory animus must be proven circumstantially, by reasonable inference. This is what the final, pretext stage of the *McDonnell Douglas* framework allows. "If a plaintiff can show that she was fired under suspicious circumstances **and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of the termination.**" *Foster*, 787 F.3d at 250 (emphasis added).

As noted, with respect to causation, Ms. Romeka maintains that she only would need to prove that her May 17 protected disclosure to Mr. Osik about the use of the TrueBeam couch was a "motivating factor" in RadAmerica's terminating her from employment; and that she has ample evidence that the reasons RadAmerica gave for terminating her employment were a pretext for retaliatory animus. We are persuaded by the cases discussed above that, in the context of the Act, where the employment action must have been taken "because of" the employee's protected disclosure, the causation

---

points out that there are genuine disputes of material fact about what happened on May 17, 2018. As explained, we are viewing the evidence in the summary judgment record in the light most favorable to Ms. Romeka, and we are not addressing legal issues that were not the basis for the grant of summary judgment. To the extent there are other legal issues that Ms. Romeka might not prevail on at trial, we are assuming, only for the sake of this opinion, that those issues would be decided in her favor.

analyses in *Nassar* and *Foster* comport with the statutory language and purpose of the HCWWPA and with the Maryland *Gasper* opinions, which applied a lesser standard of causation to the plaintiff's prima facie case.

The HCWWPA is an "unambiguous and particularized pronouncement of Maryland public policy." *Lark*, 414 Md. at 229. The purpose of the Act is precise: to protect public health and safety by protecting health care worker whistleblowers who disclose employer practices that endanger the public. Because the Act subjects employers to liability for retaliating against these employees for their disclosures, the employers either will not retaliate, to avoid liability, or will suffer compensatory and other consequences if they do, ultimately reducing the dangerous practices. In furtherance of that purpose, the *Lark* Court rejected the notion that a legitimate whistleblower complaint should be thwarted over timing that was inconsequential. *Id.* at 233.

Title VII and other anti-discrimination laws serve the broad, overarching purpose of rooting status-based discrimination out of the workplace (and other venues). This purpose cannot be achieved if discrimination is tolerated when it is even **one** motivation, among other motivations that are legitimate, for an adverse personnel action. The particularized purpose of the HCWWPA—to enhance safety in the health care sector by protecting health care workers from reprisal for protected disclosures—stands in contrast to the general aim of antidiscrimination laws. The purpose of the Act will not be advanced unless retaliation for making a protected disclosure is the actual reason the employer took the personnel action against the employee.

43

Moreover, for reasons that are similar to but show the converse of those explained in *Foster*, it would be illogical for a lesser standard of causation to apply to the prima facie stage **and** to the pretext stage of the *McDonnell Douglas* framework. The *Foster* court pointed out that if, at the prima facie case stage, a plaintiff in a Title VII retaliation case can show that but for retaliatory animus, the adverse personnel action would not have been taken, there would be no need for that plaintiff to prove retaliatory animus inferentially by showing pretext. In that circumstance, the pretext stage of the *McDonnell Douglas* framework would be unnecessary. Likewise, if at the pretext stage the plaintiff need only show a suspicious correlation suggesting a motivation to retaliate, which is what the lesser standard of causation allows at the prima facie stage, there would be no evidence at **any** stage from which jurors reasonably could infer that the employer acted out of retaliatory animus. The pretext stage of the evidence would add nothing and therefore would be unnecessary.

Finally, we share the concern the Supreme Court expressed in *Nassar* that a reduced standard of causation for retaliation could be misused by employees anticipating adverse personnel actions, especially terminations of employment. That could pose dangers in the health care setting, where employees may be facing adverse personnel actions for not complying with standards of care. If retaliation for a protected disclosure only need be **a** motivating factor in discharging an employee whose substandard work is endangering patients, the employer would not be able to discharge the employee without facing liability. That result would defeat the health and safety purposes the Act is meant to protect.

44

We turn to the evidence in the summary judgment record as it relates to Ms. Romeka's prima facie case, to which the lesser standard of causation applies. As the court in *Lewis* discussed, the facts most relevant at this first stage of the *McDonnell Douglas* framework are 1) whether the person who decided to take the employment action knew, at that time, that the plaintiff had made a protected disclosure; and 2) whether there was a close temporal proximity between the disclosure and the adverse action.

The evidence in this case is uncontroverted that Mr. Spearman was the final decision-maker on terminations of RadAmerica employees from employment; that on May 10, Dr. Rosen and Mr. Osik concluded that Ms. Romeka should be fired; that on May 16, Ms. Greer concluded the same; and that on May 17, Ms. Romeka made her protected disclosure to Mr. Osik. The evidence most favorable to Ms. Romeka, but not inconsistent with other uncontroverted timing evidence, points to the morning of May 18 as the time when Mr. Spearman made the final termination decision. There is no evidence in the summary judgment record that Mr. Spearman knew Ms. Romeka had made a protected disclosure when he made his final decision. Mr. Osik testified that he did not tell Mr. Spearman about it. Because Mr. Spearman was the final decision maker and there is no evidence that he knew about Ms. Romeka's disclosure when he made the termination decision, there is no evidence of any retaliatory animus on his part.[25]

---

[25] Mr. Osik knew about the complaint, of course, and he executed the termination decision at the meeting on Monday, May 21. He was executing a decision that only Mr. Spearman could make, however, and that Mr. Spearman already had made.

45

To be sure, the temporal proximity between Ms. Romeka's protected disclosure complaint and the final decision to terminate her employment was very close: one day, when the evidence is viewed most favorably to Ms. Romeka. It is open to debate whether close temporal proximity alone is sufficient to prove causation even under a lesser "contributed to" or "motivated by" standard. *Compare Lewis*, *supra*, to *Smith v. Strayer Univ. Corp.*, 79 F.Supp.3d 591, 605 (E.D. Va. 2015) ("[T]emporal proximity *alone* is insufficient to establish the third element of causation."). We shall assume for purposes of this opinion that it is and that on this record Ms. Romeka could make out a prima facie case of reprisal under the Act. The burden then would shift to RadAmerica.

RadAmerica has submitted considerable evidence of seriously deficient work conduct by Ms. Romeka, including falsification of a patient's medical record, that it maintains was the reason it terminated her from employment. Virtually all of that evidence consists of events that took place **before** the May 17 date on which Ms. Romeka made her protected disclosure. Obviously, when reprisal for a protected disclosure is the issue, events and conduct that take place **after** the protected disclosure are central. Reprisal is a reaction—in common parlance, pay back by one for the action of another. A reaction cannot happen before the action that prompts it. Here, it is undisputed that Mr. Blackburn's complaint about Ms. Romeka's conduct, the investigation into that complaint by Dr. Rosen and Mr. Osik, the conduct by Ms. Romeka that became the subject of the investigation (including her mishandling of the patient consent form and falsification of medical records), the repeat investigation by Ms. Greer of Medstar Human Relations, and Ms. Greer's conclusion that termination should happen all took place **before** May 17. (Indeed,

46

they almost all took place before May 15, when the motor on the TrueBeam treatment couch broke.) RadAmerica produced contemporaneously documented evidence of several serious legitimate bases for terminating Ms. Romeka. The detailed facts adduced by RadAmerica showing Ms. Romeka's poor work performance, misconduct in dealing with other employees, and falsification of a medical record plainly would satisfy its burden to produce evidence of a legitimate non-retaliatory reason to terminate Ms. Romeka's employment.

Given the proof offered by RadAmerica in its defense, the burden would shift to Ms. Romeka to show pretext: that the legitimate reasons RadAmerica has offered for firing her were not its actual reasons and instead, it fired her for making her complaint about the use of the TrueBeam on May 17. In short, as the *Foster* court explained, at the pretext stage of the *McDonnell Douglas* evidentiary paradigm, Ms. Romeka's burden would be to prove by a preponderance of the evidence that **but for her protected disclosure of May 17**, she would not have been fired. The question then is whether the summary judgment record contains evidence that would allow reasonable factfinders to find that RadAmerica's reasons for firing Ms. Romeka were not its real reasons, and thus infer retaliatory animus on its part. Without such a showing, Ms. Romeka's retaliation claim under the Act would fail, as a matter of law. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

"Pretext 'can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"

47

*Daneshvar v. Graphic Tech. Inc*., 433 F.Supp.2d 1244, 1249 (D. Kan. 2006), *aff'd*, 261 F.App'x 126 (10th Cir. 2008) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005)). *See also Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) ("[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact.").

Ms. Romeka argues that she can show pretext through evidence that RadAmerica has given various and inconsistent dates on which the decision to terminate her employment was made. She maintains that in discovery responses and affidavits, RadAmerica has identified May 10, 16, 18, and 21 as the date on which the decision to terminate her employment was made. She points to what she claims is deposition testimony by Mr. Osik that no decision to terminate her employment was made before May 18; a contrary attestation by Ms. Greer that the termination decision was made on May 16; and deposition testimony by Dr. Rosen that the decision to terminate was not made until May 21. She asserts that when this ever-changing evidence about the date of the decision to terminate her employment is viewed in a light most favorable to her, it supports a reasonable inference that RadAmerica has been untruthful not only about the date on which the decision was made but about the actual reason it was made; and that reasonable jurors could infer from that that the real reason was retaliation. This argument is not supported by the record, however.

The evidence RadAmerica furnished—deposition testimony, affidavits, and contemporaneously prepared documents—showed that there was an established step-by-

48

step process by which the decision to terminate Ms. Romeka's employment was made. First, in response to the complaint by Mr. Blackburn on May 1, Dr. Rosen and Mr. Osik, as Ms. Romeka's RadAmerica superiors in the ROC, conducted an investigation. On May 10, they decided, based on the results of their investigation, that Ms. Romeka should be terminated from employment. That was the beginning step in the process. If they had concluded otherwise, Ms. Romeka would not have been fired and the process would have ended.

Second, MedStar's Human Resources Department conducted its own investigation into Ms. Romeka's work conduct. Dr. Rosen and Mr. Osik notified Ms. Greer about the results of their investigation on May 10, and she began the Human Resources investigation on May 14. That investigation corroborated what Dr. Rosen and Mr. Osik had uncovered in their investigation (with the additional evidence of improper treatment activities reported by Dr. Lerma). RadAmerica's evidence further shows that on May 16, Ms. Greer decided to join Dr. Rosen and Mr. Osik in recommending that Ms. Romeka be terminated from employment. If she had not made that decision, the termination would not have happened, and the process would have ended. Viewed most favorably to Ms. Romeka, Ms. Greer recommended termination to Mr. Spearman, the final decision-maker, on May 18, after Ms. Romeka's protected disclosure was made.

Third, no later than the morning of May 18, Mr. Spearman made the final decision to terminate Ms. Romeka. If he had not made that decision, Ms. Romeka would not have been fired; and he was the only person with authority to make the decision final. Mr. Spearman told Dr. Rosen to go forward with Ms. Romeka's termination and at lunch time

49

on May 18, Dr. Rosen communicated that to Mr. Osik. The last, ministerial, step in the process was completing the termination paperwork and telling Ms. Romeka she was fired. Mr. Osik prepared the paperwork on May 18, Ms. Greer reviewed it on May 20, and Ms. Romeka was fired by Dr. Rosen and Mr. Osik on May 21.

The dates Ms. Romeka argues are obfuscations by RadAmerica about when the decision to fire her was made are dates on which the various decisions that preceded the final decision, and were necessary to the final decision, were made. They were not a single date that RadAmerica repeatedly misidentified, nor were they inconsistent. Necessary decisions that led to Ms. Romeka's termination were made on May 10, May 16, and May 18, and the termination was carried out on May 21.

Ms. Romeka cites the depositions of Mr. Osik and Dr. Rosen, and the affidavit of Ms. Greer, for what she contends are inconsistencies about the date of the decision to fire her, but she misstates all this evidence. Citing one particular page of deposition testimony by Mr. Osik, Ms. Romeka claims that no decision about terminating her employment was made before May 18, and therefore all the "decision" dates in the process outlined above (except May 21) were invented so it would appear that she was fired for legitimate reasons when she was not. The deposition testimony she cites does not say what she asserts it does:

> Q. [Attorney for Ms. Romeka:] Did you meet with Dr. Jacobs on the 17th of May or the 18th of May?
>
> A. [Mr. Osik:] No.
>
> Q. **So you indicated that you did some investigation of [Ms. Romeka] by meeting with other therapists, correct, on May 1st and 2nd**?
>
> A. Yes.
>
> Q. And you took notes of that, correct?

50

A. Yes.

Q. There were various complaints, correct?

A. Yes.

Q. **Now, were you contemplating, at that point, discipline against [Ms.] Romeka?**

A. **Not at that time.**

(Emphasis added.) Clearly, this answer was not a statement by Mr. Osik that he was not contemplating discipline against Ms. Romeka on May 18. Rather, he said he was not contemplating discipline against her on May 1 and 2, which was the "at that point" being referenced. This language is not ambiguous.[26]

In a similar vein, Ms. Romeka accuses Ms. Greer of perjuring herself by first attesting that the date of the termination decision was May 10, and then attesting that it was May 16. She asserts that the dates are conflicting and neither date could be correct in any event because Ms. Greer had not even finished her investigation by May 16. The basis for the latter accusation is that Ms. Greer's notes show that she interviewed one ROC employee, George Casados, on May 18. For the reasons just explained, it was not inaccurate or even inconsistent for Ms. Greer to say that decisions were made to terminate Ms. Romeka on May 10 (by Dr. Rosen and Mr. Osik) and May 16 (by herself). Second, Mr. Casados was not interviewed by Dr. Rosen and Mr. Osik at all and the fact that Ms.

---

[26] Ms. Romeka also asserts that Mr. Osik told her she would not be fired for errors with respect to the missing patient consent form. This assertion also is not supported by the record evidence. Ms. Romeka cites an email she sent to Mr. Osik on May 1, at 12:30 p.m. The entire email reads: "Chris we have another missing consent form, Dr[.] Jacobs is pretty upset with me and wants to know what to do from here? The patient finished and very well may not be with us anymore if you know what I mean, please help me if you can[.]" There is no response to that email.

51

Greer interviewed him on May 18 but already had decided to recommend termination on May 16 is not inaccurate or inconsistent either.[27]

Ms. Romeka also argues that Ms. Greer's attestation that she decided to terminate her employment is untrue because it conflicts with MedStar's denial, in interrogatory answers, that it terminated Ms. Romeka's employment. She reasons that because Ms. Greer was a MedStar employee, she could not have been telling the truth when she attested that she decided to terminate Ms. Romeka, given that MedStar attested to not terminating her. This argument has no merit. RadAmerica was Ms. Romeka's employer, and its President made the final decision to terminate her employment. As a wholly owned subsidiary of MedStar, however, RadAmerica followed MedStar's procedures for terminating employees, including having the MedStar Human Resources Department conduct a second investigation into the reasons for discharging a RadAmerica employee before the employee is terminated. Thus, RadAmerica made the termination decision, but that decision depended upon MedStar's input, *i.e.*, Ms. Greer's decision to recommend that Ms. Romeka be terminated. None of this is inconsistent, false, or misleading.

Finally, Ms. Romeka asserts that Dr. Rosen testified in deposition that the termination decision could have been made as late as Monday, May 21. That was the only date Dr. Rosen was given as a reference, and it is clear from testimony by other witnesses with knowledge and from information contained in contemporaneous documents that the

---

[27] Like all the other employees who worked with Ms. Romeka, Mr. Casados gave a very negative assessment of her conduct and abilities. He also had been involved in a complaint against Ms. Romeka in 2015, and was negative about her work at that time too.

52

decision was made no later than May 18. Indeed, Ms. Romeka has made that assertion in her brief.

The evidence about dates Ms. Romeka points to does not show any weakness, implausibility, inconsistency, incoherence, or contradiction in RadAmerica's comprehensive and well-documented reasons for terminating her from employment. It only shows that Ms. Romeka either is ignoring or is confused about the termination process RadAmerica followed. A reasonable factfinder could not conclude from this evidence, together with the evidence that Mr. Spearman had no knowledge of her protected disclosure, that the reasons RadAmerica has presented for firing Ms. Romeka were not the actual reasons she was fired and merely were a smokescreen to hide its retaliatory reason for that adverse employment action.

Ms. Romeka also maintains that the court ruled incorrectly on the causation issue because it failed to view the evidence in the light most favorable to her. She includes in this argument the evidence gathered during the investigations and related events that preceded her May 17 protected disclosure. As mentioned, reprisal is a reaction, and under the Act it is a prohibited reaction to a protected disclosure. At the pretext stage of the *McDonnell Douglas* evidentiary framework, evidence that after an employee made a protected disclosure, the employer came up with a reason to justify taking action against the employee would be highly relevant to whether the reason given was not the actual reason for the action. In the case at bar, however, the complaints about Ms. Romeka, the investigations into those complaints, the results of the investigations, and the recommendations about termination all took place before May 17, which means they could

53

not have been concocted to justify firing her in reprisal for her May 17 protected disclosure. That disclosure had not yet been made; indeed, before May 15, the subject of the disclosure did not even exist. Although the evidence was highly relevant to RadAmerica's burden on the defense of there being a legitimate, non-retaliatory reason why Ms. Romeka was fired, it was not relevant to Ms. Romeka's burden to show that the problems with her work the investigations revealed were a pretext for retaliating against her.

RadAmerica's evidence in the summary judgment record supporting the legitimacy of Ms. Romeka's termination is plausible and in line with its employment practices. Ms. Romeka has no evidence in the summary judgment record to show that RadAmerica's stated reasons for her termination were not its actual reasons and therefore were a pretext for retaliation. Accordingly, on the material facts viewed in a light most favorable to Ms. Romeka, Ms. Romeka cannot prove her retaliation claim under the Act, as a matter of law.

**II.**

**<u>Adverse Employment Action – Refusal to Allow Resignation</u>**

In deposition, Ms. Romeka testified that in her May 21 meeting with Dr. Rosen and Mr. Osik, Mr. Osik told her she was fired, and she then asked whether she could resign instead. He merely repeated that she was fired, implicitly denying her request. She also testified that she was unaware of any RadAmerica employee being fired in the previous ten years.

In her opposition to RadAmerica's motion for summary judgment, Ms. Romeka cited deposition testimony by Mr. Osik that in the five years before 2020, he had not been involved in any termination of a RadAmerica employee (except Ms. Romeka); and that

54

sometime in the preceding ten years a radiation therapist who had reported checking a machine when she had not was allowed to resign. She argued, based on that evidence, that RadAmerica's denial of her request to resign was unusual and itself was an adverse personnel action taken in retaliation for her protected disclosure under the Act.

On appeal, Ms. Romeka contends the court erred by rejecting this argument and granting summary judgment. She asserts that it is "common knowledge" that resignation is a personnel action and because the Act states that an employer "may not take or refuse to take any personnel action as reprisal[,]" the refusal to accept an employee's resignation is a personnel action. She points to various government agency forms that allow for resignation in lieu of discharge when settling EEOC cases and an Office of Budget and Management manual that defines "resignation" as a personnel action. She maintains that a personnel action need not be "adverse," quoting an Arizona Court of Appeals case that was vacated on other grounds, and argues that the evidence on the summary judgment record shows that she was not permitted to resign as reprisal for having made her protected complaint.

Ms. Romeka offers no apposite legal authority for her arguments. RadAmerica did not demand that she resign, which would be a personnel action taken against her. Rather, it fired her and she then asked to be allowed to resign instead. When she made that request, however, she was a fired, former employee of RadAmerica. In *Doe v. Johns Hopkins Health System Corp.*, 274 F.Supp.3d 355 (D. Md. 2017), the court held that an employment relationship must exist for a personnel action under the Act to exist. On that basis, it concluded that the Act did not cover a former employee's disclosure of alleged violations

55

by an employer that took place after the employee had been terminated. Likewise, the refusal to allow an already-terminated employee to resign is not a personnel action within the protection of the Act, as there is no longer an employment relationship when the refusal occurs. In effect, the terminated employee is asking the employer to rescind the termination decision and replace it with a resignation decision.

Moreover, the argument Ms. Romeka makes runs contrary to our holding in Issue I of this opinion. The evidence produced by RadAmerica showed that the severity of Ms. Romeka's work deficiencies was such that its President decided to **discharge** her from employment. The final decision was not to tell Ms. Romeka she could resign or be fired—it was to fire her. Ms. Romeka did not produce evidence to support a reasonable finding that she was fired for any reason other than those RadAmerica gave for firing her. The upshot of that is that RadAmerica was justified in terminating her employment as it did. Under Ms. Romeka's additional theory, inconsistently, RadAmerica only would be justified in taking that action if she did not ask to resign instead.

Finally, even if Ms. Romeka still were considered an employee after she had been told she was fired, which she was not, she produced no evidence that not allowing her to resign was a retaliatory act tied to her May 17 complaint. All she offered was Mr. Osik's recollection that sometime in the past ten years an employee had been permitted to resign in lieu of termination. This evidence is legally insufficient to establish any kind of pattern

56

from which one could infer that RadAmerica was treating Ms. Romeka differently from other employees by refusing to allow her to resign.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTMORE CITY AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**